of America, appellate. Mr. Rothenberg for the appellate, Mr. Taylor for the accolades. May it please the court, this is a tax case so we've cleared the courtroom mostly, but it's not a typical tax case. You have 7,000 clients, I thought they'd be, they'd all be packing the courtroom. It's not a typical tax case because we don't have to deal with complex statutes, detailed technical rules, and so forth. What we have is a fairly simple issue. Has Congress authorized the IRS to charge individuals who prepare tax returns for compensation a fee, what's called a P-10, a preparer tax identification number? We think the answer is yes. As the 11th Circuit held in Brannon, the district court below thought otherwise. The district court was wrong. Under the user fee statute, what is all that is needed for a government office to charge a user fee is if it supplies a service or thing of value. The validity of the fee does not involve a comparison of private versus public benefits or even a formal licensing scheme. All that's needed is what the Supreme Court has called a special benefit. Now Congress, I think it was 1952, enacted the user fee statute, and Congress also enacted a statute giving Treasury the authority to require something other than the use of Social Security numbers on a tax return. Congress pointed out there had been problems with improper use of Social Security number and possible identity theft, so Congress gave Treasury that authority. Now the district court's decision, in fact validating the P-10 program, was based on this court's loving case and was based on the district court in separate parts of its opinion saying that, well, you cannot impose a P-10 because it's equivalent to imposing a licensing scheme, it's functionally equivalent to granting the ability to practice, and the IRS may not regulate in this area. Can I ask in that regard, this class of 700,000, is there any differentiation between people who would qualify to be enrolled, I think called enrolled agents, versus those who are just the ordinary filers, the ordinary tax preparers? The difference is so-called credentialed preparers, those are attorneys, CPAs, and enrolled agents. Enrolled agents have to pass a test and other things before they have that designation. So could the answer, I mean, so one, could the answers be different? I mean, at least as to the credentialed ones, it seems like there's already sort of more of a licensing and regulatory scheme in place. So does the 700,000 include people that would be credentialed? All those people, even credentialed or uncredentialed, have to apply and pay for a P-10. The enrolled agents have to pay a separate fee in addition to the P-10 fee. Because I just noticed that all three named plaintiffs here are actually credentialed tax preparers. Two CPAs and an attorney, as I recall. So as to them, it seems like the licensing scheme, this is just part of an already pre-existing licensing scheme. Well, their argument presumably is weaker, but we think that, I mean, that's a relatively, a much smaller subset. You know, certainly maybe 10, 15% of the preparers are actually what's known as credentialed. So as to the ones that are not credentialed, the ordinary tax preparers, they were doing this tax preparation for years and years and years beforehand for pay. And the only requirement was that they include an identifying number associated with them as tax preparer distinct from the taxpayer. And then once we knock out the things that are knocked out and loving, then all this legislation, excuse me, all this regulation does is say use a different number. How is that, keep doing what you're doing, keep identifying yourself, you still got to do that like you have been all along, you just got to sub in a different number now. How is that giving them anything of value? What value did you add to what they were doing? Well, they actually received value from the get-go, it's just IRS never charged for it. And now IRS, beginning with the proposal in 2010, said, okay, we've re-examined the user fee statute. Before they were using their social security, are you suggesting that you could charge people for social security numbers? Well, since that has an overwhelming public benefit since everyone in the country has a social security number, so the short answer is... Folks don't have a choice about it. There's some people who don't even want it, but they still have to have it. Our theory is that the government could do the same thing. Under your definition of the value, the government could charge for social security numbers. Not just make you have them, but charge for them as well. Well, I'm not sure Congress would really like that. That's not my question. My question is your definition of the value that's required under the IOAA. Under the IOAA, it seems to me that everyone who went to a local social security office and goes to the window, presumably could say, okay, give me a dollar or something. The user fee statute, I think, would permit that, but that's a much harder case. But that's for the initial getting of a social security number. For your purposes, somebody already has a social security number, and then they have to disclose that number when they're preparing somebody's taxes, right? Well, actually, they cannot use that number anymore. They can't use it anymore, but I'm talking about the regime beforehand. Regime before? What they would have to do is they would give the social security number that, by hypothesis, they already had. Right. And as to that, what could be the basis for the IRS exacting a fee associated with just the giving of a social security number that somebody already has? I take it there wouldn't be one. No. No? Without the P-10 system, there is nothing for which you to charge. So the key is that they instituted the P-10 program. Right. The P-10 program is not just issuing somebody a number. It's the entire group of people who monitor the vendor staff who created the website for getting the P-10, who give instructions for the call center. There's a declaration in the record pointing out about how many IRS people are involved in the P-10 process. It's close to 100 people, and the user fee is intended to provide the funds for that program. I'm trying to figure out what they're doing because it's not totally clear to me. There's a third-party vendor that seems to be checking on the person. Explain to me exactly. I fill out the form online. It's a pretty short form. Submit it online, so you all don't even have to open mail. What do the folks at the IRS do? Assume this is for the initial number, and they'll have the same question for renewal. For the initial one, what do they do? And what does a third-party vendor do before that number issues? Well, if you look at JA 59 and 60, there are a whole page of items that they do. There is also, and I've got a list here I can tell you. For instance, if any preparer has been enjoined, they have to double-check. This is really very general language here on this page. What I would like to know is someone sitting at their desk. First of all, who does the background check? Third-party vendor or the folks at the IRS? Well, the background check is simply to make sure they haven't been enjoined, to make sure they are who they say they are, so it's an identity check. It's not really a background check. It's an identity check. Okay, well, it's your language. They called it tax compliance and background check. So whatever it entails, who does that? The tax compliance refers to the credentialed preparers. The P-10s or the uncredentialed preparers, because of loving, do not have a tax compliance check. So that's for the credentialed. So that part of it can't be the justification for a fee? Right. Do they get a background check? I'm sorry? Do they get any background check at all? For the P-10? Let's just assume I'm talking about non-credentialed. Non-credentialed, just to make sure that they are who they have to prove that they are who they say they are. What does that mean? They put their Social Security number in? No. I'm not sure what they do because I haven't gone on their website. Do we know if the third-party vendor does that or does the IRS do that? Most of the nuts and bolts are done by the third-party vendor. Okay, well, then what are you all doing? Because that's what the money – there's a separate charge that goes off to the third-party vendors. It's small. It's like $13, and they just said they're doing most of the work, and you all are getting 30 bucks to do what? Well, no. The third-party vendor also has a call center. People call in if they don't get the number properly or they have a problem with the number. They call in. They want to find out what's going on. There are IRS people that write scripts and Q&As for the call center. That's not the call center people. These are the answers you should give if you get X, if you get Y. They also have to – the computer interface between the vendor and the IRS, they have to contract for it. They have to monitor the program. They have to decide, are we going to rehire this vendor? There are HR people at IRS. There are lots of things they do. They give assistance. If there's a problem preparer, a non-credential preparer, and they see there's a problem, they coordinate with the Department of Justice and say, okay, this preparer is not doing this properly. So then they would say – they could refer it to DOJ and say, we would like you to bring an injunction. Really? The people in this office do that, not the general counsel's office? You've got line people that are the same people that are doing the government contracts or calling up the Justice Department asking for – Well, they're not calling them up. They're saying, we have a problem, and so they would send it to OPR typically. But, I mean, everyone – What happens for a renewal? You don't change the numbers in the annual renewal. I assume the whole point of this is to have a consistent number so you can track folks. No, no, you don't change the numbers for a renewal. What happens on the renewal? Well, they have to do the same check to make sure they have not been enjoined. Make sure they haven't been enjoined, okay. Do you have to check again that they're still who they say they are? I assume that didn't change in the intervening year. Well, you know, I would assume that they might have to do that also. But, I mean, there are 95 people that are doing – that do this, the P-10 program. Presumably on remand, if we were to hold that this comes within the statute, this calculation of whether you've charged a fair price would be determined, is that right? Exactly, exactly. That's the purpose of the section, which makes it based on the costs to the government. Exactly, and, of course, the plaintiffs did challenge that, and that has not been determined yet. And that would be on remand, is the current fee, which is $33 plus a vendor fee, is that a reasonable fee under the circumstances? Speaking of the costs to the government, after loving, I understand your argument that at least part of the fee originally in the first rule you acknowledge had to do with things that loving said you could no longer do, correct? Exactly. Did you give a refund for that? No, they stopped charging once the district court loving decision came down. Right, but the loving concluded that it was invalid from the get-go, so why not – did they not ask you for a refund? The plaintiffs want a refund from the get-go, from 2010. Don't you acknowledge you owe the first year's 2010, is it? No, because a lot of the initial start-up costs, they figured, okay, how much is it going to cost? And so they figured it was $50. There are a lot of significant up-front start-up costs, and that's why post-loving they said, okay, we've already incurred these costs. It's not costing us $50. So you haven't been doing any of the other work with respect to registered repairs? No, they've been doing the – Like the background checks, et cetera. Have you been doing that? They were – until it was enjoined, they were doing everything they said they were going to do in 2010. So the $50 was based on not just the P-10 program itself but also the – I understand. So there's two different parts of it. I suppose they have an argument that at least part of that money they're entitled to get back because you were not allowed to collect that money in the first place. Well, that would be a remand question because that certainly would be an – that would be for remand because you'd have to have, okay, what did they spend – what did IRS spend their money on? How did they use the $50 per – The paragraph on JA-59 that is from the Federal Register 66-794 that sets out what the fee is compensation for, that came after loving, right? On JA? It's on JA-59, it's paragraph 58. So there's a – it's just above what you – I think it's – you were just having a colloquy about it. 66 is – yes, that is probably pre-loving. I'm just guessing from the number in the Federal Register. Oh, I thought it was post-loving. I think it – wasn't it 2015? Do I have the dates wrong? Paragraph 59 says as of November 2015. I believe Your Honor was quoting the – I guess just my question is it looks – the agency's explanation, I think, for the user fee is that block quote in paragraph 58, the PTIN. The PTIN user fee is based on direct costs of the PTIN program, which includes staffing and contract-related costs for activities, processes, and procedures. Well, that has to be pre-loving because it talks about tax compliance and so forth. These are not done. The best explanation for post-loving is in the Federal Register on October 30th of 2015, which is – I mean I have the site, but it's – It's 829. I thought this language is actually post-loving. And that's what's confusing me because this language I think is 2015. Loving was 2014. And I think you're right to assume that it has to be pre-loving. That's the confusion that I have because it seems like you would look at this language and you would think it would be pre-loving, but it's not. Okay. The tax compliance and background checks, that is for credentialed preparers. That is still done. So I didn't want to have any misunderstanding. They still do tax compliance and background checks for all credentialed preparers. They do not do that for uncredentialed preparers. But the PTN user fee, it's assessed against everybody, right? Yes, yes. So then at least part of what's in this paragraph, it doesn't make sense to say that this user fee is justified based on the things that are itemized in this paragraph because with respect to uncredentialed tax preparers, some of these things just don't have any applicability. But the only things that do not have applicability would be the tax compliance and the professional designation. But certainly foreign preparer processing, you do that. There's just some things in here that can't justify. There are a few things that do not apply to uncredentialed preparers. But this is the stated IRS justification for the fee. It's the last thing they have. But there's also, it's not just this paragraph, but further on 80 Fed Register 66-792, there's an entire paragraph that talks about why they're doing PTNs. And they talk about it enables IRS to more easily identify and communicate with tax preparers.  And that it enables IRS can issue targeted updates. If they see there's a problem with a certain preparer, and it could be the preparer erred in the taxpayer's favor or erred in the taxpayer's disfavor, IRS can then use the PTEN program to send out what is called a targeted update. Okay, we notice you failed to... All those attributes of the system would have equally been the case with the Social Security number. It may have some other problems to use the Social Security number, but as long as you have an identifier of some sort, including a Social Security number. You certainly could have done that, but Congress clearly didn't want it to move away from the Social Security number. Congress didn't mandate that. Well, no, no, there's a Senate report that indicated that there was a problem. So that's the time when Congress gave Treasurer the authorization. The authorization to do it. Exactly. Yeah, but not a mandate. Exactly. But, I mean, you know, not using Social Security numbers, IRS has also indicated in the Federal Register that does, at least presumably, does benefit the preparers. I mean, there are lots of things in terms of benefits. It's just right here where the only thing here is the threshold. Can IRS charge a user fee? And we think this Court's jurisprudence in CFERS and so forth points out that you clearly can. I mean, it doesn't matter, you know, whether the ultimate purpose of a program is to benefit the public. Presumably anything an agency does presumably benefits the public. And CFERS also pointed out that it doesn't matter if a user fee is considered to be personally beneficial to the person who has to pay it. That's not the test. The test is, is an identifiable person getting a benefit that is not available to the general public? And using that language, getting a benefit, does that assume that they gained something they didn't have otherwise? Without the P-10, they cannot prepare a return. I'm asking your definition of value or benefit here. And does that mean that they're getting something they couldn't have otherwise? It's a value-added proposition. Yes. They're getting money for preparing a return. They can't do that unless they have a P-10. Well, they're not getting that money from you. It's from someone else. So they were doing that before you required that they have the P-10. Again, if it's value-added, then I'm having trouble understanding how filing returns, make money, use your Social Security number, and then on this date use a different number but keep doing everything you were doing the same before as value-added as opposed to simply a different identifier being employed by the IRS. And, of course, we don't want you to file without using the right identifier because we can't do our job without it. The best answer is that it doesn't have to be value-added. It simply has to be value. The fact that the IRS did not charge a P-10. So it could be pre-existing value? Exactly. And the Brannon case points out that it doesn't – let me have that right here. It says, and I'm quoting from the Brannon case. It says, nothing in the language of the user fee statute nor in logic prohibits an agency from implementing a fee for services that it had previously provided for free. I'm still not quite understanding what the service was before because if before it was a Social Security number, not a P-10. I understand if IRS creates a P-10, then IRS needs to create an apparatus to administer the P-10 because that doesn't otherwise exist. But if it was Social Security numbers before, your argument is, well, we could have assessed a fee before, and all we're doing now is capturing a fee that we could have assessed before. What would the fee have gone to if it was Social Security numbers before? It would be a different question if they didn't institute the actual P-10 system. In other words, your question is, what if IRS just said you can use Social Security numbers and then we're going to charge you? That's a different, potentially harder question. This Court doesn't have to go there. I don't understand why we don't have to at least understand why introduction of the P-10 didn't add some value because if it didn't add any value beyond what was already there with the Social Security number, and there was, as you say, it's a harder question, so there's at least a possibility that no fee could have been assessed with respect to the Social Security number, then it seems like the addition of the P-10 would have to change the calculus in some way that made the otherwise dubious assessment of a fee non-dubious. Well, the Federal Register, all of the various preambles point out that it is, and they specifically say it is beneficial to the preparer not to have a Social Security number because even though it's supposed to be redacted and you're supposed to not include it in the calculus. This is the one justification that I get, which is that when you move away from a Social Security number, it helps preserve the Social Security number, and that I get. There's a question as to whether that was actually ever asserted as the basis for the P-10 number, but to be abstract, I can understand that. But it seems to me that if we think that that justification for moving from SS number to a P-10 number, which is that we're doing that because it protects people's Social Security number, if that's not stated as a basis for justifying the P-10 number, then it's hypothetical, it might well be true, but it's not actually one that we can act upon because it wasn't uttered by the agency as the basis for moving to the P-10, and then there would have to be something else that's the value added by the P-10. Well, besides the part about they can have targeted communication, but they can do that with a Social Security number. That's what I think it's the same line of questioning that Judge Millett is pursuing, but if everything they can do with a P-10, they could have done with a Social Security number, and the justification for moving to the P-10 is not to protect the Social Security number, what's left as the basis for the fee with the P-10. Well, the whole process whereby if they do not, the P-10 program is also looking at what are you doing if you have bad preparers, okay? They have to have a mechanism for, okay, if they find a bad preparer, I mean, it does get, your question is really what difference does it make, what number they use? Yeah, exactly. So that seems like that could have been done with a Social Security number. I'm not saying it couldn't be done without a Social Security number, but what I am saying is that in terms of the user fee statute, what I call the user fee statute, they could have, if the requirement is you have to have that or you cannot prepare a return for compensation, our position is that's a special benefit and you can charge for it. Right, and that argument would be equally true of the Social Security number. I think it would be. Right, so then that's a different question because, I mean, earlier you were saying that that would be a harder question. Now it sounds like that's actually maybe essential to your argument. I'm not saying you're wrong about that, but it sounds like where we are now is that, yes, what all the P-10 does other than protect the Social Security number, let's just put that to one side. You may have an argument as to why we shouldn't put that to one side, but let's just suppose we're putting that to one side, that the justification for the P-10 is not that it protects the Social Security number. Then if everything the P-10 does is the same thing that the Social Security number does, then it has to be the case that the IRS could have assessed a fee just for not giving the Social Security number because that's something somebody already had, but for monitoring the person who gives the Social Security number. Yes, yes. So they can say, okay, I mean, because if they find errors on a preparer, IRS wants to be able to contact all the people who had returns filed by that person. So the short answer is yes. So then your argument devolves into whatever. I don't mean to be pejorative by saying devolved, but it reduces to the ability of the IRS to assess a fee if we were in the prior regime where it was the Social Security number. Yes, my answer would be yes, they could charge a fee. And the district court's rationale for not charging the fee is just not right. There is no connection between Loving and the district courts. The only connection is that I'm standing before you like I did in Loving. That's the only connection I see between the two cases. Well, it wasn't me. If I have any time left, I'd like to save it for rebuttal. You don't have any time, but we're really lax here. Thank you, and may it please the Court. Jonathan Taylor for the Plaintiff's Appellate. In 2010, the IRS attempted to create an occupational licensing scheme for tax return preparers. And to effectuate that scheme, the agency would start requiring preparers. Isn't it the case that the preparers asked for a PTIN because they wanted it to protect their confidentiality? That's what the early comments are. When Congress passed the statute that allowed the use of the PTIN, there were hearings, and at the hearings, the tax preparers all said they were worried about their Social Security numbers. They wanted an alternative. Is anything I just said wrong? No. So in 1998, Congress authorized the IRS to change the identifying number if it wanted to. And they did it in part at the request of tax preparers who were worried about their Social Security numbers. As to the privacy concern, I would just make a couple of points. So it was the case that until 2010 when the IRS decided to mandate PTINs, it offered an optional PTIN for free for people who were concerned about the security of their information. And I think at that point, to help protect those preparers' Social Security numbers, the IRS could have charged a fee. But what happened in 2009 is then the IRS allowed tax preparers to omit their identifying numbers from the taxpayer's copy of the return to protect their ______. So that's an argument about there are two different ways in which the government can process things. But that's not up to us to decide which is the better method. Obviously, the government finds it helpful for other reasons to have a number that people can track. Once you have that and you have to establish a number, the preparers would prefer a PTIN over a Social Security number, wouldn't they? Well, many of them already had a PTIN in 2010. And just on privacy, I would just note that in the rulemaking, the IRS doesn't identify anywhere the privacy rationale as the basis for the fee if you look at the fee regulations. That seems like a different question. It seems to me we have two different issues here. One is whether this is a service that's being provided or a thing that's being provided. And the second question is how much it's worth. But the first question about whether this is a service or not, a benefit that only affects some people and not others, seems to me to be satisfied. I just quickly marked three places where they did make the statement that Judge Srinivasan was asking whether they made, which was the protection of the confidentiality of the preparer's SSNs. It seems obvious to me, it must seem obvious to everyone now, that the IRS is not too good at protecting our Social Security numbers. Anybody who can't, I mean, that seems something we can judicially recognize. And all they need to say is that we aren't very good at this. And this protects the preparers. You're not suggesting you want to go back to a system where every preparer has to put their Social Security number on? No, I'm not suggesting that. But all that I'm saying is that in the rule that authorized the fee, the PTIN fee, the agency doesn't identify as the asserted special benefit or thing of value protecting the confidentiality of Social Security numbers. Well, I'm looking at the proposed rule in 2010, and it says, listing the things that the use of PTINs as the identifying number will, benefit tax payers and tax return preparers, and help maintain the confidentiality of SSNs. That's at your A3. Well, I'm looking at A10, which is the succinct statement of the objectives of and legal basis for the proposed rule. And at the bottom of the middle column, the IRS says quite clearly that the individuals who obtain a PTIN receive the ability to prepare all or substantially all of the tax return preparers. That's another reason, but I'm looking at a column entitled Explanation of Provisions Requiring the Use of PTINs. And it says one of the three reasons they give is to help maintain the confidentiality of SSNs. They say, again, in the 2010, I don't know, let's see what this is, the final rule, that most of the comments received on the Notice of Proposed Rule making support the requirement to use a PTIN as the exclusive identifying number. And those comments come from tax preparers who are worried about their returns. And then there is another one on the final 2010 rule, listing what commentators are suggesting in the third column, the identity protection provided by PTINs. So maybe they didn't do the best possible job, but this is one of those ones that seem obvious that using another number than your Social Security number protects you. I don't see why they have to state it any more than that. I want to be clear. The IRS had already issued PTINs to people who had requested them, who were concerned about their Social Security numbers being disclosed. But in 2010, what the IRS started doing is it started mandating PTINs and it imposed some eligibility criteria because it wanted to use a PTIN as an occupational license. I think those reasons that we struck down in Loving, they can't use anymore. But Congress did authorize them to require a single number, correct? It did. And they did require a single number. And the choice about whether it's a PTIN or a Social Security number is really not our business here. The only question is whether, having chosen a PTIN, it fits within the user fee statute. Isn't that right? We are not challenging the requirement that tax return preparers obtain a PTIN. We're challenging the fee. And this is a large annual fee to keep a random ID number that's permanent. Maybe it's too large. It does seem large to me also, but that's something that can be disputed below. Well, I think it's relevant to the justification. So we have two arguments for why the fee is unlawful. One is a lack of statutory authorization. The other is the impermissibility of the IRS's justifications in the rulemaking. Can I just ask you one question about that on the justification? So suppose the justifications just as explicitly as could possibly be the case said part of the justification, even post-loving, part of the justification is to protect Social Security numbers. Then would you still have an argument that they can't assess a fee at all, or would your argument be about the amount? I think if the asserted special benefit in this hypothetical was helping safeguard confidential information, and it was an optional system, I think that that would be a special benefit. Why does that have to be an optional system? Well, I think there has to be some sort of voluntary act. Well, that's not the way with any of the other permits that courts rule on. Those are all mandatory. Now, I understand you have an argument that this isn't like that, but there's no rule that has to be voluntary in that sense. Well, I think the case that I would look at just on the statutory question is the CFRS case that my friend pointed out, which actually lays down the framework for when the asserted justification is the ability to make a living off of a certain type of occupation. That's the asserted rationale here to the rulemaking. It's the argument that the IRS makes. It is correct that without the P-10, they could not be preparing returns for compensation, correct? I think the way I would answer that is... That's what Brannon says, its explanation, which says nothing at all about the thing that we struck down in Loving. A person cannot prepare tax returns for another for compensation unless that person obtains from the secretary the required identifying number. That's true, correct? That's true, but I think what I would say is that in 2010, most people already had a P-10, and then the IRS mandated that everyone, even if you already had a P-10, pay an annual fee just to keep the number, and so everyone already had the number. And then if you really want to see this, look at the 2015 rule, where everyone has already been required to pay for the P-10, and the IRS thinks it's a good idea to charge $50, $33 on its own, and then $17 to a vendor, for the person to keep the number they already have that is a permanent number that doesn't change and has no eligibility criteria. And I think the IRS kind of gives the game away a little bit in acknowledging, when Judge Srinivasan read the justification for the rule for the 2015 fee, my friend thought that you were talking about the fee pre-Loving because they're continuing to charge for activities they cannot conduct, and I think that shows that they're at best in denial about the consequences of this Court's decision in Loving and at worst in defiance of it. I think what it shows is that there may be some parts of the fee that you should be able to get back, but that's to be determined below. It may be that there are some parts of the fee that are justified in charging. And I didn't see any comments by you, or in fact anyone, on the 2015 reduction in the fee. Were there any comments found? No, but our complaint is not that the IRS failed to adequately respond to a comment. It failed to adequately respond to this Court's decision in Loving. It didn't really take seriously the consequences, I think. It's one thing for the agency, if it thinks it's using this number as an occupational license, to start charging a fee on an annual basis to ensure continued compliance with eligibility criteria. But the problem is the IRS didn't have that licensing authority in the first place. They do have the authority to acquire a single number, correct? They do. They have the authority. And it wasn't arbitrary and capricious, leaving aside the statute, to decide to use the PTIN rather than some mixture of numbers. We haven't challenged it as being arbitrary or capricious. But if you look at the rule, the justifications are shot through with references to those. You haven't challenged the decision to have a PTIN rather than a Social Security number. We haven't challenged the rule that requires a PTIN for lack of statutory authority. You have not. We have not. I would note that even that regulation imposes eligibility criteria on who could obtain a PTIN, but the district court in Loving enjoined it from being enforced. So now you can't? How many people do you represent? It's a class of 700,000 people. So 700,000 out of however many hundred millions of people in the United States are the only ones who have to provide the PTIN, correct? That's correct. And they can obtain compensation when they prepare somebody else's return. So they are completely distinguished from all the other hundred millions of Americans. This is a benefit that goes only to them, the benefit of being able to charge for preparing a return. And that's a benefit that they already had. I don't understand why that matters. We held in Central and Southern that it doesn't matter that they were giving it away for free before. You agree that that's not the line here, that they were giving it away for free? No, that's absolutely right. The IRS has the, I mean, any agency, it's not forced to exercise its authority to charge a user fee even if that's authorized. And it can later if it decides it wants to charge. It can do that if it has a reasonable basis for why it thinks, just under the APA, that it makes sense now to change its policy, and I do want to get to that shortly. But it doesn't have to be, all they have to do is have a good reason. So the good reason can be we weren't charging before, and now we're charging because we're allowed to. And that seems to be a perfectly good reason. In fact, Congress might be quite mad at them for not charging user fees. Well, they don't charge for any other permanent ID number that they issue. Well, can I ask this? So in the world beforehand, when it was optional to get a P-10, suppose that what the IRS says is our default mode is social security numbers. We're going to give you so that you can protect your social security number. We're going to give you the option to have a P-10, but we're going to charge you. Nothing wrong with that. I think they would have the statutory authority to do that, because the service of being of value in that case but not in this case would be allowing someone to protect the safety of their information. So just to be abstract, there's nothing necessarily wrong with charging for a P-10 because in that universe that would have been fine. No, that's exactly right. And then the distinction that we have, the two potential distinctions that you're pointing to now is it's mandatory rather than voluntary, and that the justification, in fact, at least as a stated matter formally in the 2015 rule, didn't explicitly incorporate protection of social security numbers. I think that's right. I think the other thing I would add to that is just as a statutory matter under the IOAA, what you have here is it's not just, they're not just charging, the agency didn't just think it was charging for a random number. It thought it was charging for a real occupational license at the time, that it created the P-10 requirement and created the requirement that prepares to pay an annual fee for obtaining that number and renewing it. And I think that when the asserted rationale is an occupational licensing rationale, that the framework is provided by this Court's decision in CFARES, and what the Court said there is that a user fee for license applicants is only permissible if the procedures in question are related to the qualifications set forth in the licensing statute. And the problem here is there is no licensing statute. There are no eligibility criteria. Who could obtain this so-called license anymore? And so you have to. Well, there are. I mean, it's not much. It's not like the credentialed preparers. But in 6694 and 95, there are actually some regulations of tax preparers. Yes. And plus, now this is how you'll continue to do that business. But it's not an entirely laissez-faire activity. It is policed and regulated. District judges have the authority to enter injunctions restraining someone from preparing tax returns if they've committed fraud on a repeated basis. And the federal government can prosecute those cases. But it can impose penalties under 6694 and 95 itself. It can. It can impose penalties on tax preparers for doing things bad. So that sounds like there is, in fact, some licensing scheme that might be a fairly minimal one. But is that relevant, or why isn't that relevant? Well, there are no eligibility criteria for who can obtain this license. Well, there are. You've got to be over 18. You've got to not be enjoined from doing it. And I can't remember if there's something about foreign status. So I don't know where they get the authority to say that minors cannot get one. That doesn't come from a statute. But what I would say is if you look at the PTIN application, I submitted an application last week just to see what this is like now because it's free, it's been enjoined. Do it while you can. And you supply some basic identifying information. Notably, they don't ask if you've been enjoined from preparing tax returns, which if that were a driving force, you would expect them to ask that question. And then within two or three seconds of submitting this basic identifying information, I got a PTIN, a random ID number that was generated by this third-party vendor. And so if the PTIN is the sole basis for why, you know, the key that allows you to prepare tax returns in the IRS's eyes, the sole basis for why they can charge a fee for it, the IRS does nothing in order to help facilitate that. Well, they have your name, don't they? They do have your name. So presumably they could check whether you had previously listed yourself without a PTIN. And when they go for renewal, they could just check the database under the PTIN to determine whether you had understated due to unreasonable position, which is 6694, 6695, had previously failed to identify, 7407 had an injunction against you. These are all elements of your ability to practice. Well, I think what they could do is if they wanted to check to see whether I'm complying with their various tests or whatever it is that they do exactly, I think they could potentially, I suppose, try to revoke a number at some point. But surely the revocation of a PTIN is not a service or thing of value for which they can charge a fee. I mean, anyone with a pulse and a credit card can get a PTIN at this point. It just doesn't serve any function. Well, it doesn't serve everybody in the United States. It only serves the people who are trying to get compensated for preparing somebody else's return. So it may be true that anybody with a pulse can get it, but it does no use for anybody other than somebody who wants to be compensated. I think what you're pointing out is that this is really just kind of, at this point, a kind of zombie licensing scheme that isn't really rational. And I think, if anything, that just, I think, strongly suggests that the IRS is not really engaged in reasoned decision-making. It just does not make sense in 2015 to, you know, after everyone already has a PTIN and there are no longer any eligibility criteria for who can get one, to persist with an annual $50 fee. Well, if it turns out on remand that it doesn't cost the government anything anymore, that there were fixed costs which have already been sunk and there's no further costs, then you get your money back. But there are going to be renewals, there are going to be new people, presumably the universe of people who want PTINs is not fixed. In fact, here you are. You just bought yourself one recently and you didn't have one before. So that must have cost something. There is an excessiveness claim on remand, but what I would, I just want to point out, my friend referenced a declaration from the director of the Return Prepare office, and you can find this at J171. We cite it on the last page of our brief. This is, I'll give you a second to get to it because I think it's actually pretty important. This is the director of the Return Prepare office here is telling this court in Loving that, quote, I'm looking at the bottom of paragraph 12, the last sentence, JA171. The combined PTIN and competency tester user fees received by the service through the end of calendar year 2012 exceeded $105 million, which some may only be spent on the registered tax return prepare program. That is the program that this court invalidated in Loving. I mean, the fees are being used entirely to support this unauthorized regulatory regime. And I wouldn't, I mean, don't just look at that declaration. You could also look at the rulemaking. If you go to A9, which is the addendum to our brief, there are two paragraphs that I think are the money paragraphs in the bottom left-hand column where the IRS is explaining. We didn't charge a PTIN before, a fee for a PTIN before, but now we are. And the IRS says the reason is because before anyone could get a number and it didn't have much content, but now we're going to do real eligibility checks to determine who qualifies. And so they say, the IRS currently issues PTINs to tax return preparers without charging a fee. That's a key to the reader that, okay, now we're going to explain our change of policy. The PTIN application issuance and renewal process, however, will become significantly more expansive and intricate with the implementation of the registered tax return preparer program. Federal tax compliance checks will be performed on all. What year was that? What year was that? That was in 2010. Yeah, so that's before Loving and before it was struck down, which brings me to the next question. So your amended complaint was filed before the 2015 rule, correct? That's right. And you asked, among other things, you asked for vacating the rule, right? The district court's final opinion is only about what's wrong with the 2010 rule. It doesn't even mention the 2015 rule, and yet it permanently enjoins government going forward from ever having this. This means even with a justification, you know, 50 pages on why identity theft happens of Social Security numbers, which, again, I don't think is really required, it still wouldn't be okay. Or even if the IRS said, look, it doesn't really cost 50 bucks, it costs $2, because we have to keep up the website, we have to pay the webmaster, we have to check renewals, determine whether you've been enjoined. All of that has been enjoined by the court. The typical thing that a court does in an APA case is to vacate the rule that's being challenged. The only rule you challenged is 2010. Help me with why the judge didn't overstep. Okay, so there's a lot in there. But what I would say first is that the district court here, it found that there was no statutory authority for the IRS to charge a PT. So you have to live or die on the argument that there is no statutory authority at all. No, I don't think we do. But let me just first try to get this part of the answer out. So if you find that there's no statutory authority, obviously it doesn't matter whether the IRS tried to supplement its justifications in 2015.  And I would just note that the IRS has not sought to stay in this court of that injunction. And now, as to the justifications, if you were to find that there is statutory authority, now we're going to look to see whether the agency's justifications are reasonable in light of the scope of the agency's statutory authority. I think that the 2010 rule, in our view, is just clearly out. It's obviously motivated by a desire to implement this licensing scheme, and it's a licensing fee, it operates like a licensing fee, and there's no licensing authority. But then if you look at 2015, the first point I would make is obviously just under Chenery, this rule cannot retroactively justify fees that are imposed under a rule that rested on a faulty foundation. But then, again, I think the 2015 rule, in the one paragraph that Judge Srinivasan mentioned earlier, where the IRS is trying to explain all the things that it's doing, and this is at v. 29, which is the addendum to our brief, if you want to follow along. I mean, even this justification, it's the second paragraph in the middle column, the IRS can't help but refer to all these various compliance checks and other things that they're doing that have no bearing on whether somebody gets a PTIN, which is the sole basis for why they charge a fee. And so I don't, I mean, I think this is an agency that, I mean, it might have the ability to collect taxes, but it doesn't have the ability to create taxes. And the way that this annual fee is operating right now is as a kind of tax or an occupational license or what have you, but it's just not reasoned decision-making. And I think also just in a sense that the IRS, if you look at the top paragraph here of v. 29, the IRS is explaining that the amount of the user fee, it's $33, whether you've got the PTIN or not already, whether you're renewing or whether you're applying in the first instance because the costs to the government are the same. Now, if that's true, then what the IRS is effectively saying is that the marginal cost of actually having a database generate this random number, which the government doesn't even do, it's a third-party vendor that does, is effectively zero, and it probably costs more for the agency to issue this rule than it does to issue a random ID number that doesn't change. And that's just not rational. I mean, yes, you could view it as an excessiveness question, but I think it's better to just say this is not, there's no way you could think that an agency that is operating under a proper conception of its own authority would issue the rules either in 2010 or in 2015 that the IRS has done here. And I think whether you view that as through the lens of a lack of statutory authority under CFARES or as just arbitrary or capricious under this Court's general approach, I think it's unlawful. Can I ask you, I just have two questions. One is, when Congress passed the statute that authorized the IRS to use, to issue TPINs, do you know what Congress's rationale was? I don't know if there's legislative history or anything. Were they concerned about Social Security numbers? There is one line in the legislative history that references a concern that, you know, there might be some, you know, Social Security numbers could be inadvertently disclosed, and so to help protect the confidentiality of Social Security numbers, the IRS would have the discretionary authority to judge to exercise it to allow for another alternative. Were there other purposes that were identified for that statute? Why else would Congress say, hey, if you want, you can maybe use a different number? It didn't identify, there's only one sentence in the legislative history. That's all there is about that statute. That's all there is. There's certainly no indication. But there was a hearing on the statute. And in the hearing, there are statements by tax preparers, including the international president of the Tax Executives Institute, which is not provided to us here, but which says, and I'm just going to quote, in today's world of instant access to volumes of sensitive information about an individual, including even credit reports accessible over the Internet, practitioners are understandably concerned that their Social Security number could be the key to unauthorized release of their personal financial information. Practitioners feel that the requirement that they include their Social Security number on returns violates their privacy, as it could provide a possibly unscrupulous taxpayer the opportunity to access certain records that would not otherwise be available. So, and it goes on. So I appreciate this is not in the record, but it is the hearing that led to the report. If they would reissue the rule and cut and paste this section of the practitioners' severe concern back in 1998 about the risks of their privacy, would that be sufficient to sustain their rule? Well, it wouldn't be sufficient to sustain the fee rule. It might be sufficient to sustain the PTIN rule, which we're not challenging. But I would also point out that the previous regime, before the PTIN mandatory rule was put in place, was that the tax return preparer had the option. You could put your Social Security number on the form, or if you were really concerned about confidentiality and other things, you could apply for a PTIN from the IRS, and they would help you safeguard the confidentiality of your own information. And I think, I mean, so if the sole concern is just effectuating Congress's purpose, there was no reason for the IRS to move away from that regime. But you just drew a distinction between the underlying requirement and the fee part of it. If it was voluntary, you'd have no problem with the fee. If it's voluntary, the asserted benefit is that we're helping you protect your Social Security number. It's not an annual fee because it's a one-time thing. We would not have a problem with that rule. And then does that mean that the agency then couldn't just say, look, we understand that some people might actually not care about the privacy of their own Social Security number, but that this is a society-wide systemic problem. We're just not going to allow that risk to persist because it causes too many collateral consequences. So everybody's going to have to have a PTIN because disclosure of Social Security numbers is a problem, and then we're going to exact the same fee that we would have in the prior regime where you did it voluntarily. I think I get two responses. First, as to whether the IRS would have the statutory authority to mandate the PTIN requirement in that case, they absolutely would have that authority. And then as to whether they would have the authority to charge a fee, if the asserted special benefit is not a licensing benefit, which is what the asserted special benefit is here, but we're helping you protect your information, then I think that would probably qualify. You'd have a difficult question about this. Is it voluntary? Is it not? Given that the agency has no other real regulatory authority? I mean, it might be that under CFARES – So there could be a mandatory fee, a mandatory PTIN requirement that results in a mandatory fee. It sounds like there could be. Now, you might have a great claim that, boy, the amount of that fee better be pretty darn small because – It better be a one-time fee. The justifications better be pretty good. The IRS better say why it thinks this makes good sense. But I think if it were a one-time fee and the asserted special benefit were different and we had a very different case than we have here, I think that would be a much stronger case for the IRS to be able to sustain that fee. But we are miles away from that here. The IRS is charging a massive annual fee to people who already have the number that doesn't change. And that just makes no sense given that there are no eligibility criteria. It might make sense if the IRS had licensing authority. It doesn't have that. And so the fee that was intended to fund the failed licensing scheme should be returned to tax return preparers. I am sorry because I had a second question. And I just want to check one thing on – before someone can bring a refund suit like this against the IRS, they have to submit a claim to the IRS for a refund. The complaint said one of the named parties did. Do you know – does that mean the other two named parties didn't? And do we know – do class members have to do that, too, or does that not apply to class actions? I don't know the answer to that, but I can't imagine that the class members or the named plaintiffs in this case would be forced to go through with this futile administrative exhaustion requirement that I don't think really exists in a case like this. Well, it's actually – there's a statute and it's jurisdictional. That's why I asked the question. Well, I just don't think it applies because the agency – I think that that statute exists where if you've got a problem with your return or you have some – you should go first to the agency before you file a suit. Well, any sum alleged to have been excessive that was collected by the IRS. So it's not just taxpayer returns. Well, I mean, if the court is concerned about that, we'd be happy to file a 28-J or a supplemental brief or something, but I just don't think that that type of exhaustion requirement would apply here and it hasn't been addressed by the parties or below. All right. Thank you. Isn't it plain under any theory that you're entitled to a refund of at least part of the money that was originally required under the 2010 rule? And if so, why? From the 2015 rule that the IRS – they're not backing down. Instead of refunding the PTIN fees after loving, they've continued to insist on this annual fee. There is no way that someone in an office somewhere in the IRS would give a refund for someone who paid a PTIN fee when the agency's position is they've issued a rule saying we've got the authority to do this. And so we are challenging that rule and we're not – I mean, it is true that the consequence of challenging that rule is that any fees that were collected based on that rule would be returned as restitution. But this is not a suit for a refund. I'm sorry. I didn't mean it in the sense of a taxpayer having to separately file for a refund, but part of your request below would be any parts of – at least any parts of the cost that reflect the pre-loving requirements. That's right. And I would just – I would also note that if you look at docket 51 below, it's a joint scheduling order at page two, the parties agreed that if we prevailed on our first claim, which is the claim, the sole claim on that issue on appeal, not the excessiveness claim, that the natural consequence of that would be that, quote, the members of the class will be entitled to a refund of the PTIN fees they have paid to date. The IRS will cease charging fees in the future and the case will be concluded. And so I think it's common ground in this case that the consequences of unlawful agency action would require reimbursement of the fees. Okay. Thank you for the questions. Okay. Again, I promised you we'd be flexible. If you don't want us to be flexible, that's fine. Unless you have any questions, the PTIN fee is currently not being collected because of the district court's injunction. Can I ask you a jurisdictional one? Because you had originally raised jurisdiction and then it seems to have fallen out, so I just – am I wrong to think that the refund position applies here? This is not a refund of tax, so the normal tax rules about claim for refund and all that do not apply because you're not seeking a refund of the tax. Any sum elects to have been excessive or in any manner wrongfully collected. And I guess their whole theory is that it is a tax, right? It's not a user fee, so it must be a tax. So I'm a little confused about what to do. You all raised this jurisdictional issue initially and then dropped it. Yeah, we have not raised it again in our brief. I just want to make sure I'm doing due diligence on this. It's interesting. So if you win – You don't think it's a tax. If you win, it's not a tax. But if they win, it is a tax and they should have sought a refund and they can't be here? That's a nice catch-22. I didn't think about that. Maybe I should have put that in my brief. Thank you. You're welcome. All right. Thanks to all of you. We'll take the matter under submission.
judges: Garland, Srinivasan, Millett